UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

2004 MAR 29 P 3: 11

U.S. DISTRICT COURT
HARTFORD, CT.

RICHARD J. SARTOR, DIANA
SARTOR,
    Plaintiffs,

v.

TOWN OF MANCHESTER,
    Defendant.

Civil Action No.
3:02 CV 70 (CFD)

**RULING ON MOTION FOR SUMMARY JUDGMENT**

The plaintiffs, Richard J. Sartor and his wife, Diana Sartor, brought this diversity action against the Town of Manchester alleging breach of contract (counts one and two) and tortious breach of contract (counts three and four) in connection with Mr. Sartor's retirement from his position as Town Manager.[1] The plaintiffs seek declaratory and injunctive relief,[2] as well as compensatory and punitive damages. Pending is the plaintiffs' Motion for Summary Judgment [Doc. #7].

**I.    Facts**[3]

Richard J. Sartor ("Sartor") was employed by the Town of Manchester ("Town") for over twenty-one years. He started as the Town's Deputy Chief of Police and later became its Town Manager. He held the position of Town Manager for approximately twelve years. In accordance

---

[1] Jurisdiction is based upon diversity of the parties and an amount in controversy exceeding $75,000, pursuant to 28 U.S.C. § 1332(a)(1). Personal and subject matter jurisdiction are uncontested. Additionally, the parties do not dispute that Connecticut state law applies.

[2] The request for declaratory and injunctive relief is set forth as count five of the complaint.

[3] The following facts are based on the parties' Local Rule 9(c) Statements and other summary judgment papers and are undisputed unless otherwise indicated.

1

with the terms of the Town Charter, Sartor worked throughout his tenure as Town Manager without a contract and at the pleasure of the Town's governing body, its Board of Directors ("Board"). Board members are elected biennially, in November, by Town voters.

Some time prior to 2001, Sartor and his wife began considering retirement and a permanent move to their summer home in Rhode Island. When the Sartors received an offer to purchase their Manchester home in the spring of 2001, they decided to consider the option of retirement in Rhode Island more seriously. The Sartors subsequently entered into a contract to sell their Manchester home. The parties dispute whether the Sartors then took steps to purchase a condominium in Manchester to live during the remainder of Sartor's tenure as Town Manager.

Sartor subsequently consulted with the Mayor and other members of the Board concerning retirement options, and a severance agreement ("Agreement") was generated as a result of those discussions. Sartor agreed to the terms of the Agreement and it was brought to the Board for its consideration. Section 6 of the proposed agreement provided that Sartor's unused accrued sick and vacation time would be considered as wages for the purpose of calculating his pension benefits after he retired. This amount - in excess of $80,000 - would have the effect of increasing his annual pension payments.

On July 19, 2001, the Agreement was placed on the agenda of the Board meeting, which Sartor attended. After debate, the Board approved the Agreement by a vote of five to three, with Democrats and Republicans voting along party lines. The Republican members of the Board voted against the Agreement because they disagreed with the enhanced pension benefits Sartor was to receive as part of his severance package. After the Board approved the Agreement, both the Mayor and Sartor signed the Agreement. Sartor then tendered his resignation, to be effective

November 1, 2001.

In response to criticism from the Republican members of the Board that the Agreement violated state law, the Town attorney sent the matter for review to an outside pension counsel, Attorney Bruce Barth ("Barth"). Barth furnished an opinion to the Town which stated that the Agreement appeared to be legal and fair, but that Item 6 of the Agreement could be interpreted as inconsistent with section 11-39 of the Town's pension ordinances. Section 11-39 of the Town's pension ordinances provided that an employee's pension shall be based on the employee's wages or salary and not any "maintenance or other special payments or renumeration" provided to the employee. Barth maintained that the Pension Board could interpret the leave payments as being "special payments" under section 11-39, rather than wages or salary, notwithstanding the language of the Agreement. Accordingly, Barth suggested that the Board pass an ordinance which would specifically provide that those payments were Sartor's salary or wages. In accordance with this recommendation of counsel, an ordinance was prepared, a public hearing was held on August 28, 2001, and the matter was scheduled for a vote at a meeting of the Board on September 13, 2001.

At the September 13 meeting, the Board did not vote on the ordinance, and instead, a substitute motion was made to rescind Sartor's severance agreement. The motion was approved unanimously. The Board rescinded Sartor's severance agreement, but accepted Sartor's letter of resignation and agreed that Sartor was eligible to apply and receive "a normal retirement pension in accordance with the terms of the Town's Supplemental Pension Ordinance as well as the same retirement benefits and payouts of unused accrued sick, vacation and annual leave time" afforded to other Town department heads.

3

Sartor left his employment as Town Manager in accordance with the terms of his resignation letter and moved to Rhode Island. Sartor did not receive the benefits of the Agreement, including the enhanced pension benefit of Section 6. He and his wife subsequently brought this suit, alleging breach of contract and tortious breach of contract. They seek compensatory and punitive damages, as well as a declaratory judgment that the actions of the Town rescinding the Agreement were invalid, legally ineffective, and ultra vires, and a permanent injunction invalidating the recission of the Agreement and ordering reinstatement of the Agreement.

The plaintiffs have moved for summary judgment, as to liability only, on counts one (breach of contract as to Sartor) and two (breach of contract as to Mrs. Sartor).[4] The Town claims that several genuine issues of material fact exist that preclude summary judgment.

## II.    Summary Judgment Standard

In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). A court must grant summary judgment "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact . . . .'" Miner v. Glen Falls, 999 F.2d 655, 661 (2d Cir. 1993) (citation omitted). A dispute regarding a material fact is genuine "'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Aldrich v. Randolph

---

[4]Count two is based on Mrs. Sartor's status as a third-party beneficiary of the Agreement. The defendant does not appear to dispute that she is entitled to that status.

Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir.) (quoting Anderson, 477 U.S. at 248), cert. denied, 506 U.S. 965 (1992). After discovery, if the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then summary judgment is appropriate. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The Court resolves "all ambiguities and draw[s] all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." Aldrich, 963 F.2d at 523. Thus, "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir.), cert. denied, 502 U.S. 849 (1991). See also Suburban Propane v. Proctor Gas, Inc., 953 F.2d 780, 788 (2d Cir. 1992).

### III.  Discussion

As noted above, the Sartors have moved for summary judgment, as to liability only, on the breach of contract claims. The Town claims that genuine issues of material fact exist as to (1) whether the parties intended the Agreement to be final or subject to conditions subsequent; (2) whether the Agreement is supported by adequate consideration; (3) whether the Agreement is void for illegality or impossibility; and (4) whether the Agreement is void for Sartor's breach of fiduciary duty he owed to the Town. The Court will examine each issue below.

#### A.  Intent of the Parties

The elementary principles of contract interpretation under Connecticut law are well established: "(1) [t]he intention of the parties is controlling and must be gathered from the language of the [contract] in the light of the circumstances surrounding the parties at the execution of the instrument; (2) the language must be given its ordinary meaning unless a technical or special meaning is clearly intended; (3) the [contract] must be construed as a whole

and in such manner as to give effect to every provision, if reasonably possible." Peter-Michael, Inc. v. Sea Shell Assoc., 244 Conn. 269, 275, 709 A.2d 558 (1998). "'[I]ntention is to be determined from the language used, the circumstances, the motives of the parties and the purposes which they sought to accomplish.'" Id. at 276 (quoting Klein v. Chatfield, 166 Conn. 76, 80, 347 A.2d 58 (1974)). A determination of contractual intent generally presents a question of fact, but where the language is clear and unambiguous, it becomes a question of law for the court. See id.; see also Tallmadge Bros., Inc. v. Iroquois Gas Transmission System, L.P., 252 Conn. 479, 495, 746 A.2d 1277 (2000) ("[T]he interpretation and construction of a written contract present only questions of law, within the province of the court ... so long as the contract is unambiguous and the intent of the parties can be determined from the agreement's face....").

"Contract language is unambiguous when it has a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." Brunoli v. Brunoli & Sons, 993 F. Supp. 66, 73 (D. Conn. 1997) (quoting Care Travel Co. v. Pan Am. World Airways, 944 F.2d 983, 988 (2d Cir. 1991)). In contract actions involving the interpretation of contractual language, summary judgment is appropriate only when the language of a contract is wholly unambiguous when considered in light of the surrounding circumstances and undisputed evidence of intent. Orange Improvements P'ship v. Cardo, Inc., 984 F. Supp. 85, 89 (D. Conn. 1997) (citing Sharkey v. Ultramar Energy Ltd., 70 F.3d 226, 230 (2d Cir. 1995)). The moving party has the burden of establishing that the language of the contract is not susceptible to at least two fairly reasonable meanings. See id. If that party cannot establish unambiguous contract language, a material issue exists as to the parties' intent and the non-moving party may introduce

extrinsic evidence on that issue at trial.  See id. (citing Wards Co. v. Stamford Ridgeway Assocs., 761 F.2d 117, 120 (2d Cir. 1985)).

Here, the Town argues that it never intended the Agreement to constitute a final, binding contract.  Rather, the Town argues, the Agreement was merely a proposal, provisionally approved by the Board of Directors and subject to a condition subsequent–the passing of an ordinance reconciling it with the relevant pension statutes.  The following facts, argues the Town, demonstrate such: (1) neither the Town Attorney, nor the Town's pension counsel were involved in the discussions culminating in the drafting of the Agreement; (2) Sartor drafted the agreement by himself; (3) the Agreement conflicted with the pension ordinances; and (4) the Agreement expressly indicated that the Town's pension ordinances applied "as modified."  According to the Town, those facts demonstrate that the Agreement was not a final contract, but one subject to a condition subsequent–the legislative amendment of the pension ordinances in order to provide for the classification of Sartor's leave payments as "wages."

The Court concludes, however, that no genuine issues of material fact exist as to whether the Agreement was intended by the parties to be final and unconditional.  As noted above, "[w]hether the written contract was actually the final repository of the oral agreements and dealings between the parties depends on their intention, evidence as to which is sought in the conduct and language of the parties and the surrounding circumstances."  Associated Catalog Merchandisers, Inc. v. Chagnon, 210 Conn. 734, 739, 557 A.2d 525 (1989) (internal quotation marks omitted).  Here, none of the evidence set forth by the Town creates a genuine issue of material fact as to whether the Agreement was final or subject to the legislative amendment of the pension ordinances.  Rather, the undisputed evidence indicates that the Town and Sartor

intended the Agreement to constitute the final repository of their negotiations regarding his severance and that *after* the Agreement was made final, the Town changed its mind, inquired into whether the Agreement should have been made subject to the passing of an ordinance, and rescinded the Agreement. It was only after the Agreement had been approved by the Board and executed by the parties that questions were raised concerning whether the Agreement would violate the pension ordinances.[5] The evidence noted by the defendant does not reveal any factual dispute as to the intent of the parties at the time the Agreement was signed. Nor does the record suggest that the parties intended the Agreement as a proposal or as subject to the Town's amendment or modification of the pension ordinances. To allow subsequent events, such as the Board's change of heart, to upset the Agreement is inconsistent with basic contract law. "The courts do not unmake bargains unwisely made." See Osborne v. Locke Steel Chain Co., 153 Conn. 527, 218 A.2d 526, 530 (1966).

The Court also finds that the Agreement was not ambiguous as to any issue. The Agreement clearly states that Sartor's leave payments would be classified as "wages," rather than special payments or renumeration.

**B.     Consideration**

"[C]onsideration has been defined as a benefit to the party promising, or a loss or detriment to the party to whom the promise is made." Finlay v. Swirsky, 103 Conn. 624, 131 A. 420, 423 (1925). An exchange of promises is sufficient consideration to support a contract. See Osborne, 218 A.2d at 531. See also Town of Trumbull v. State of Connecticut, 206 Conn. 65, 73, 537 A.2d 431 (1988).

---

[5]It appears that the execution of the Agreement was also witnessed and notarized.

The Town argues that there are genuine issues of material fact as to whether the contract is supported by consideration. It argues that Sartor has not set forth evidence of a benefit that the Town received in exchange for his generous severance package, and that his promise to resign cannot constitute consideration because he was an "at will" employee. The Town cites a Fifth Circuit case in support of its argument, Sheline v. Dun & Bradstreet Corp., 948 F.2d 174 (5th Cir. 1991). In Sheline, the Fifth Circuit held that an employee's promise to resign voluntarily and forego any claims against his employer constituted "little (if any)" consideration for the employee's severance agreement because he was an "at will" employee. 948 F.2d at 178 (citing Martin v. Credit Protection Ass'n, Inc., 793 S.W.2d 667, 670 (Tex. 1990) ( "continuation of an employment at-will relationship does not constitute independent valuable consideration to support the covenant [not to compete]")). However, Sartor's promises are distinguishable from the illusory promise made by the plaintiff in Sheline based on an unenforceable covenant not to compete. Moreover, unlike Texas, Connecticut recognizes that continued employment is adequate consideration to support non-compete covenants with at-will employees. See Weseley Software Development Corp. v. Burdette, 977 F. Supp. 137, 144 (D. Conn. 1997); NewInno, Inc. v. Peregrim Development, Inc., 2002 WL 31875450 at *9 (Conn. Super. Ct. Dec. 3, 2002); Russo Assocs., Inc. v. Cachina, 1995 WL 94589 at * 3(Conn. Super. Ct. Mar. 1, 1995) (citing Osborne v. Locke Steel Chain Co., 153 Conn. 527, 531, 218 A.2d 526 (1966); Iseli Co. v. Connecticut Light & Power Co., 211 Conn. 133, 136, 558 A.2d 966 (1989)); Daniel V. Keane Agency, Inc. v. H.A. Butterworth, Jr., 1995 WL 93387 at *7 (Conn. Super. Ct. Feb. 22, 1995); Van Dyck Printing Co. v. DiNicola, 43 Conn. Supp. 191, 196, 648 A.2d 898 (1993), aff'd, 231 Conn. 272, 648 A.2d 877 (1994).

9

The Court concludes that there are no genuine issues of material fact as to whether the contract is supported by consideration. Sartor promised to retire in exchange for the benefits the Town promised to give him under the Agreement. In addition, Sartor promised to remain as Town Manager until October 31, which would provide the Town with a period to find his replacement. As noted above, an exchange of promises is sufficient consideration to support a contract and courts do not generally inquire into the adequacy of consideration. See Osborne, 218 A.2d at 531. Accordingly, the Court finds sufficient consideration for the Agreement.

C.    **Illegality**

Under the doctrine of illegality, a party to an unlawful bargain cannot recover damages for its breach. See Restatement of Contracts § 598. The Town argues that the Agreement violates Conn. Gen. Stat. § 7-450a(b), which provides that no ordinance or act altering the pension system shall be enacted unless the Town seeks and receives an actuarial assessment.[6]

The Court concludes, however, that Conn. Gen. Stat. § 7-450a, "Actuarial evaluation of municipal pension systems," does not apply to the undisputed facts of this case, where the Town entered into an Agreement with an individual employee. The legislative history of § 7-450a

---

[6]Conn. Gen. Stat. § 7-450 provides:
    Any municipality or subdivision thereof may, by ordinance, establish pension and retirement systems for its officers and employees and their beneficiaries, or amend any special act concerning its pension or retirement system, toward the maintenance in sound condition of a retirement fund or funds, provided the rights or benefits granted to any individual under any municipal retirement or pension system shall not be diminished or eliminated. The legislative body of any such municipality, by a two-thirds vote, may provide for pensions to persons, including survivors' benefits for widows of such persons, not included in such retirement or pension system.
Conn. Gen. Stat. § 7-450a(b) provides:
    (b) No ordinance or act altering the pension or retirement system shall be enacted until the legislative body, as defined in subsection (3) of section 7-425, has requested and received a qualified cost estimate from such enrolled actuary.

10

reveals that the main purpose behind mandating actuarial studies is to ensure that municipalities have adequate knowledge as to the future cost of their pension plans. Conn. Gen. Assembly House Proceedings 1977, Volume 20, Part 10, pp. 4233-4249. § 7-450a was a response to situations in cities "where serious deficits have suddenly cropped up and people haven't expected until they were all of a sudden confronting them and one of the major sources of these unprojected deficits was an inadequately analyzed actuarial plan for retirement plans." Id. at 4238 (statement of Rep. Goodwin).[7] In addition, the legislature appeared to be concerned with the increase in collective bargaining, with its consequent impact on municipal budgets. Id. at 4238, 4246. The legislature intended that such actuarial studies would be required only where proposed changes in pension plans affected a number of participants or could have a material effect on the funding of the plans.[8] There is no indication in the legislative debate that municipalities would be required to have an actuarial assessment performed in every instance where a municipality entered into individual agreements with employees. There is also no mention of severance agreements in the legislative debate. Instead, the focus of the debate was centered on material impacts on municipalities' pension funds. Thus, the legislative history of § 7-450a does not indicate that the Town was required to perform an actuarial assessment before

---

[7]Conn. Gen. Stat. § 7-450a(a) requires actuarial evaluations of municipal pension funds every five years.

[8]It is undisputed that Sartor's enhanced pension benefit had an immaterial effect upon the Town's pension fund. Although the Town maintains that similar retirement agreements could have such an effect on the pension fund if they entered into such agreements many times, that is not before the Court.

entering into the Agreement with Sartor.[9]

The Town has made no showing that the Agreement "alters" the pension system. Sartor's agreement affected no other municipal employees as to their benefits under the Town's pension plan. The Town of Manchester itself also expressly reserves the right "to alter or vary the rate or amount of ... benefits payable, or the method of computation of any pension payments at any time" under its pension ordinances. See Manchester Code, Section 70-29.[10] Accordingly, the Court finds that enforcement of the Agreement would not be illegal.

### D.     Fiduciary Duty

The Town also argues that Sartor's failure to advise the town that Connecticut state law required an actuarial assessment before entering into the Agreement constituted a breach of fiduciary duty and voids the Agreement. However, as noted above, the Court finds that the Town's approval of the Agreement did not alter the Town's pension system and did not violate Conn. Gen. Stat. § 7-450a. Accordingly, even assuming without deciding that Sartor owed a fiduciary duty to the Town, the Court finds no breach.

---

[9]The language of the statute itself also supports this analysis as it limits the requirement of actuarial assessments to "*ordinance[s] or act[s]* altering the pension or retirement system," Conn. Gen. Stat. § 7-450a(b) (emphasis added), which would have more general application and more significant consequences than addressing an individual's participation and benefits.

[10]Plaintiffs have also presented evidence which has not been contradicted by the defendant that an actuarial review had been undertaken before the execution of the Agreement. See Sartor's Supplemental Aff. dated August 30, 2002 and Sartor's Supplemental Local Rule 9(c)(1) Statement.

## IV. Conclusion

For the foregoing reasons, the plaintiffs' motion for summary judgment [Doc. #7] is GRANTED. A judgment of liability shall enter for the plaintiffs on counts one and two.

SO ORDERED this 29th day of March 2004 at Hartford, Connecticut.

CHRISTOPHER F. DRONEY
UNITED STATES DISTRICT JUDGE